LDS DEVELOPMENT, LLC,
substituted in place of
Stonecrest Properties, LLC,
*Plaintiff-Appellant,*

*v.*

CITY OF EUGENE;
Developers Surety and Indemnity Company;
and The Real Estate Development Group, LLC,
*Defendants-Respondents,*

*and*

EUGENE WATER & ELECTRIC BOARD,
*Defendant.*

Lane County Circuit Court
161211098; A158294

382 P3d 576

Karsten H. Rasmussen, Judge.

Christopher P. Koback argued the cause for appellant. With him on the briefs was Hathaway Koback Connors LLP.

Anne C. Davies argued the cause for respondent City of Eugene. On the brief were Jerome Lidz and Glenn Klein.

Thomas M. Christ argued the cause for respondent Developers Surety and Indemnity Company. With him on the brief were Julie A. Smith and Cosgrave Vergeer Kester LLP; and Jonathan W. Monson and Cable Huston LLP.

No appearance for respondent The Real Estate Development Group, LLC.

Before Armstrong, Presiding Judge, and Hadlock, Chief Judge, and Shorr, Judge.

**SHORR, J.**

This action arises from a to-date failed housing development in Eugene. Although it involves multiple parties, it primarily relates to the question of whether two of the parties have an obligation to construct certain public infrastructure improvements outlined in the agreement authorizing the subdivision and development of the property. Under that agreement, which we refer to throughout this opinion as the development agreement, the original developer agreed to install water supply infrastructure and a sewer system, and posted a bond securing that obligation. Years after the original developer withdrew from the project without completing those improvements, plaintiff LDS Development, LLC (LDS) purchased the property. LDS then joined this action as a substituted plaintiff,[1] alleging that the City of Eugene was obligated to complete the improvements or enforce the bond securing the original developer's obligation. The city brought two counterclaims, one for declaratory relief and the other for breach of contract, asserting in each that LDS was obligated under the agreement to complete the improvements as successor to the original developer. The trial court granted summary judgment in favor of the city on all of the claims and counterclaims.

LDS now appeals the trial court's judgment granting summary judgment in favor of defendant City of Eugene against LDS's claims and granting summary judgment to the city on its counterclaims against LDS. In the first and second assignments of error, LDS argues that the trial court erred in granting the city's motion for summary judgment, which dismissed LDS's first and second claims against the city. Those claims both allege that the city was required either to complete the improvements or call in the bond. LDS's third assignment of error pertains to the grant

---

[1] LDS is the third developer to acquire the property at issue in this appeal. This action was initially filed by LDS's predecessor, Stonecrest Properties, LLC. After LDS acquired the property, it successfully moved to substitute as plaintiff in Stonecrest's place due to the transfer of interest. *See* ORCP 34 E.

We note that, in a separate appeal, Stonecrest challenges the dismissal of its claims against Developers Surety and Indemnity Company (DSIC). The decision in that appeal is separately issuing today. *Stonecrest Properties, LLC v. City of Eugene*, 280 Or App 550, 382 P3d 539 (2016).

of summary judgment in favor of the city's two counter-claims against LDS. LDS argues that the trial court erred in concluding that it was successor to the original developer's responsibilities and obligations under the development agreement.[2]

We conclude, as to the first and second assignments of error, that the trial court did not err in granting summary judgment against LDS's first and second claims. The city does not have any contractual or statutory obligation to construct the infrastructure improvements at issue in these circumstances.[3] We further conclude, with respect to the third assignment of error, that the trial court erred in granting summary judgment in favor of the city's counterclaims. As explained below, those rulings were based on the erroneous premise that LDS is contractually bound under the development agreement. Because LDS is neither a party nor an assignee to the development agreement, LDS has no contractual obligation under it. And, because the city's counterclaims do not allege that the obligation to construct the improvements is a covenant running with the land or an equitable servitude (as opposed to a personal contractual obligation), we do not address or decide those issues. Accordingly, we reverse and remand as to the grant of summary judgment on the city's first and second counterclaims.[4]

---

[2] LDS raises a fourth assignment of error concerning an award of attorney fees to the city. That assignment of error is unreviewable because the general judgment does not conclusively determine the amount of fees owed to the city. *See Petersen v. Fielder*, 170 Or App 305, 309, 13 P3d 114 (2000) (holding that a trial court declaration that a party is entitled to attorney fees is not final without a determination of the fee amount); *Lehman v. Bielenberg*, 257 Or App 501, 511, 307 P3d 478 (2013) ("[T]his court can address issues related to attorney fees only on appeal from a judgment that is 'final as to the matter of attorney fees,' including a determination of any fee amount."). However, following the entry of the general judgment, the trial court entered a supplemental judgment that awarded the city its attorney fees and costs. That judgment is the subject of a separate appeal in *LDS Development, LLC v. City of Eugene*, 281 Or App 776, 383 P3d 976 (2016).

[3] We reject the city's arguments pertaining to standing without discussion.

[4] As noted, we do not reach LDS's fourth assignment of error because the attorney fee issue is not yet properly before us and is subject to a separate pending appeal from a supplemental judgment awarding fees. *See* 280 Or App at 614 n 2. That issue is unreviewable because the general judgment from which LDS appeals does not contain a determination of any fee amount, and, thus, is not final as to the attorney fee issue.

We review a trial court's grant of summary judgment to determine whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law, and, in so doing, we view the facts in the light most favorable to the nonmoving party. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). We state the underlying facts, which are undisputed, in accordance with that standard. ·

This is one of four appeals arising from litigation over the unfinished Moon Mountain subdivision development in Eugene. We relate only the historical and procedural facts that are relevant to this particular appeal. The Real Estate Development Group, LLC (REDG) was the original Moon Mountain developer. REDG entered into a development agreement with the city that authorized the subdivision of the original large parcel into 102 smaller residential lots, with spaces dedicated for roads and other public improvements.

Several aspects of the development agreement are significant. The only parties to the agreement were the city and REDG. The agreement required REDG to complete certain infrastructure improvements in two phases, with phase 1 pertaining to one area of the development and phase 2 pertaining to another, with phase 2 to be developed after the completion of phase 1. Relatedly, the agreement required REDG to post a bond in an amount equal to the estimated cost of completing the phase 2 water and sewer improvements as a condition to final approval of the project. The agreement did not, however, expressly impose any affirmative obligation on the city to complete the improvements. In addition, the agreement provided that "[t]here is no intent on the City's part to bestow a benefit on individual third parties," and that the city has "sole and unfettered discretion" to seek damages or specific performance in the event of a breach by REDG. It included a provision stating that the prevailing party in any suit or action brought under it was entitled to attorney fees. Finally, a "successor interest" clause provided that the agreement was "binding upon heirs, executors, administrators, and assigns of both parties and is a condition and covenant running with the land."

As required under the development agreement, REDG obtained a bond for over a million dollars securing its obligation to complete the phase 2 improvements. Developers Surety and Indemnity Company (DSIC) issued the bond. Under its terms, the bond would become void once REDG constructed the improvements free of defects. Otherwise, the bond would "remain in full force and effect" and DSIC would be "held and firmly bound unto the City of Eugene as [o]bligee."

REDG completed work on phase 1 of the development, but, due to financial difficulties, abandoned the project shortly after starting work on phase 2. In lieu of foreclosure, REDG transferred its interest in the development to Umpqua Bank.

Stonecrest Properties, LLC, later acquired the subdivision from the bank. Stonecrest filed this action, which LDS later joined, alleging various claims against multiple defendants, including the city and DSIC.[5] Among other things, the operative complaint alleged that, under various statutes and regulations and the development agreement, the city was required to enforce DSIC's bond or to complete the phase 2 infrastructure improvements itself.[6] Based on those allegations, LDS sought a declaration to that effect in its first claim for relief and sought specific performance of the obligation to construct the improvements in its second claim for relief.

The city's answer denied that it had any legal or contractual obligation to complete the improvements. In addition, the city asserted two counterclaims, the content of which is particularly important to our analysis of the third assignment of error.

The city's first counterclaim sought a declaration that, "to the extent the Improvements are required to be

---

[5] As noted above, LDS eventually acquired the property and substituted as plaintiff in place of Stonecrest. There is no evidence in the record that REDG's contractual obligations under the development agreement were ever assigned to Stonecrest or to LDS.

[6] In the separate opinion we are issuing today, we reject Stonecrest's argument that Stonecrest is a third-party donee beneficiary that has standing to enforce DSIC's bond to the city. *Stonecrest Properties, LLC*, 280 Or App at 552.

completed, [LDS] obligated itself to complete the Improvements as successor to REDG's responsibilities and obligations under the Development Agreement." The city's second counterclaim, for breach of contract, alleged that LDS was "successor in interest to REDG's responsibilities and obligations under the Development Agreement" and had breached the agreement by failing to correct hazards created by improper construction activity. The city sought attorney fees for both counterclaims, invoking the attorney fee provision in the development agreement. Finally, in its prayer, the city requested that the trial court enter a judgment:

> "1.  in favor of the City and against [LDS] on the City's First Counterclaim declaring that [LDS] is the successor in interest to REDG's responsibilities and obligations under the Development Agreement, that [LDS] is responsible for completing all of the Improvements, and that the City is entitled to its reasonable attorney fees, costs and disbursements;

> "2.  in favor of the City and against [LDS] on the City's Second Counterclaim awarding the City its reasonable damages resulting from [LDS's] breach of the Development Agreement in an amount not to exceed $50,000 plus an award of reasonable attorney fees, costs and disbursements."

The city moved for summary judgment against LDS's first and second claims. It argued that LDS "can't require the city to exercise its discretion to call the bond" or to build the improvements itself, contending that "just because something is platted doesn't mean that the city then has the obligation to go back and build improvements." In addition, the city pointed out the potentially drastic implications of LDS's claims:

> "[E]ssentially what [LDS] wants this Court to do is any time something is platted and dedicated, which has to occur under our laws before they can go out and build it, and that developer then goes bankrupt or abandons it, every city and every municipality in the state has to go forward and complete those."

LDS responded that the trial court should deny summary judgment because the city "does have an obligation to install those improvements" under case law and under ORS 92.090, which, among other things, makes city

subdivision plat approval contingent upon a bond or other financial assurance securing the subdivider's obligation to construct and install public infrastructure improvements such as sewage disposal and domestic water supply systems. LDS argued that, because the city had signed off on the original development agreement, and because a bond was required by law, the city was now obligated to complete the improvements or to force DSIC to complete them by calling in the bond.

In addition, the city concomitantly moved for summary judgment in favor of its declaratory judgment and breach of contract counterclaims, both of which were expressly predicated on LDS's alleged obligations "under the development agreement."[7] The city provided three alternative legal theories concerning the source of those obligations, arguing that (1) the development agreement created a covenant running with the land; (2) even if there was no covenant, the agreement created an equitable servitude; and (3) as a purely contractual matter, LDS was successor to REDG's obligations and responsibilities under the development agreement. The city explained:

> "[W]hether you want to call it a covenant, whether you want to call it an equitable servitude, whether you want to look at the language of the agreement, however you want to do it, this is a binding obligation. And the binding obligation is that the new purchaser [LDS] is going to build out the improvements."[8]

LDS responded that it was not bound by REDG's obligations under the development agreement, arguing that the agreement does not create obligations that run with the

---

[7] DSIC joined the city's motion for summary judgment.

[8] At the hearing, the city argued that any one of those three legal theories would justify both counterclaims (for declaratory judgment and breach of contract). It did not address the possible tension between its covenant and equitable servitude theories and the nature and content of its counterclaims, which indicated that LDS's alleged obligations arose from contract—*viz.*, "under the development agreement." In other words, the city did not explain how—without actually alleging or seeking a declaration that the development agreement created a covenant running with the land or an equitable servitude—it was entitled to declaratory judgment under a theory that the development agreement created an encumbrance that was enforceable against LDS. Nor did it address how a covenant or servitude could give rise to a breach of contract claim.

land and that it had no contractual obligation because it was neither party nor assignee to the development agreement.

As noted, the trial court ultimately resolved all of those matters in favor of the city, granting the city's motion for summary judgment against LDS's first and second claims and granting summary judgment in favor of the city's first and second counterclaims. The court did not announce its decision at the summary judgment hearing, nor did it explain its reasoning in any written order. Furthermore, neither the order granting summary judgment nor the general judgment that followed contained any statement concerning what declaratory relief, exactly, the city was entitled to against LDS; no declaration setting forth the parties' respective rights and obligations as to the counterclaims was ever entered.[9] *See* ORS 28.010 (giving court the power to declare the rights, status, and other legal relations in a declaratory judgment action). Thus, because the operative order and judgment provide no guidance, in ascertaining the content of that grant of summary judgment, we look to the pleadings. *See Burks v. Lane County*, 72 Or App 257, 260, 695 P2d 1373 (1985) (although the proper disposition of declaratory relief claims is to declare the parties' rights, absent a declaration, we look to the pleadings to discern what relief was granted).[10] That circumstance is particularly important to our disposition of the third assignment of error.

On appeal, the parties generally reiterate the arguments they made before the trial court. We begin by addressing LDS's first and second assignments of error, relating to the trial court's dismissal of LDS's first and second claims, before proceeding to the third assignment of error, which pertains to the grant of summary judgment in favor of the city's counterclaims.

---

[9] The order granting summary judgment merely provided that the city's motion "is granted," and the general judgment provided only that "JUDGMENT IS HEREBY ENTERED in favor of the City against Stonecrest and LDS on the City's First and Second Counterclaims."

[10] Indeed, where there is a justiciable controversy, the parties are legally entitled to a declaration of their respective rights. *Burks*, 72 Or App at 260. While LDS does not assign any error to the absence of a declaration of the parties' rights, the trial court may have an opportunity to issue a declaration on remand in light of our reversal of the grant of summary judgment in favor of the city and DSIC on the city's counterclaims.

LDS argues that the trial court erred in granting summary judgment to the city against LDS's first and second claims. It asserts that various provisions of ORS chapter 92 and related provisions of the Eugene City Code implicitly require the city "to complete the improvements if the developer fails to do so." LDS specifically points to provisions of the city code that relate to the requirement that the city obtain a bond as a condition for approving a final subdivision plat when public improvements are not completed. In addition, LDS contends that the city is contractually obligated under the development agreement.

LDS's arguments are unavailing. The statutory scheme that LDS invokes ensures that a developer's obligation to complete certain public improvements is guaranteed by a bond or other financial assurance, and, in that way, shapes a city's ability to approve a subdivision plat. *See* ORS 92.090(4) - (5) (requiring that a subdivider provide a bond or other financial assurance to secure its obligation to construct sewer and water improvements); ORS 92.040 (requiring initial city or county approval of a proposed subdivision); ORS 92.044 (requiring governing municipality to adopt standards and procedures for the approval of subdivision plats, including various public improvements); Eugene Code 9.8360 and 9.8565 (requiring a performance bond in an amount sufficient to assure the completion of all required public improvements as part of final planned unit development and subdivision plat). However, those statutes and city code provisions do not require that the city actually exercise its right to call in a bond or complete the improvements itself in the event that a developer fails to do so. Certainly the city may exercise its discretion to complete planned improvements or to enforce a bond provided by a subdivider who failed to fulfill its obligations, but, under the operative statutes, the city is not required to do so. Nor does the city's acceptance of the dedications in the development concomitantly create an obligation that it construct planned improvements upon the dedications. *Cf. Prosch v. City of La Grande*, 14 Or App 546, 549, 514 P2d 351 (1973) (holding that a city's acceptance of a dedication does not obligate the city to construct improvements there; "[t]he mere fact that a street has been dedicated by a developer to the public in a

plat accepted for filing by a city planning commission itself imposes no duty upon the city to open that street"); *Barton v. Portland*, 74 Or 75, 79-80, 144 P 1146 (1914) ("A municipal corporation is under no obligation to open a dedicated street until its use is deemed necessary by the common council.").

Furthermore, just as that statutory scheme does not support LDS's contentions, the development agreement and bond cannot be construed to require the city to do anything. To the contrary, by their terms, and consistent with the above-described provisions, the development agreement and the bond explicitly grant the city *exclusive* discretion with regard to pursuing remedies or enforcing the bond in the event of a breach by REDG, and confer no rights on LDS or any third party to force the city to take such actions. *See* 280 Or App at 615-16.

In sum, LDS's legal theory is unavailing as a matter of law, and there is no evidence to support its contention that the city had a contractual obligation to construct the improvements. Accordingly, the trial court did not err in granting summary judgment in favor of the city against LDS's first and second claims for relief.

We turn to the third assignment of error, challenging the trial court's grant of the motion for summary judgment in favor of the city's two counterclaims. On appeal, LDS argues that the trial court erred in necessarily concluding that LDS was successor in interest to REDG's obligations under the development agreement. As before, LDS maintains that there is neither a contractual nor an encumbrance basis for such an obligation.

Defendants city and DSIC both respond that summary judgment on the city's counterclaims is appropriate because the development agreement created either a covenant running with the land or an equitable servitude. According to defendants, LDS's "status as owner of land subject to an affirmative covenant running with the land" makes it a successor in interest to REDG's obligations under the development agreement. In other words, defendants argue that LDS's obligation to fulfill REDG's promises under the development agreement arises from LDS's ownership of encumbered land. They do not argue that LDS has

a personal contractual obligation to complete the improvements or is an heir, executor, administrator, or assign of REDG. Rather, they maintain that LDS's obligations arise from an encumbrance created by the development agreement contract between the city and REDG.

The problem with defendants' arguments is that they seek to defend something that does not exist. As already noted, although both counterclaims were granted, the trial court did not expressly declare the city's rights under the first counterclaim, leaving us with only the generically contractual content of its pleadings for purposes of evaluating what relief, exactly, the trial court determined that it is entitled to. *See Burks*, 72 Or App at 260. And, also detailed above, the operative pleading, the city's answer, sought only a declaration that LDS is "successor to REDG's responsibilities and obligations under the Development Agreement." It did not allege that the development agreement created a covenant or servitude, nor did it allege facts that would allow us to infer that it sought a declaration that LDS had an obligation arising from an encumbrance on the land. Thus, in granting the city's counterclaim, the trial court necessarily ruled only that LDS is REDG's successor in interest under the development agreement and did not reach any contention regarding a covenant running with the land. The trial court's ruling is essentially based on a contractual obligation that is traceable from REDG to LDS. That ruling is qualitatively different than a ruling that the development agreement had created an enforceable encumbrance that runs with the land.

In short, the judgment, by reference to the operative pleading, simply does not establish that the trial court declared that the development agreement created a covenant running with the land or an equitable servitude. Accordingly, we do not consider or decide those issues. *Cf. M. K. F. v. Miramontes*, 352 Or 401, 425, 287 P3d 1045 (2012) ("[W]e look to the pleadings to ascertain the nature of the relief that plaintiff requested."); *Ying v. Lee*, 65 Or App 246, 251, 671 P2d 114 (1983), *rev den*, 296 Or 487 (1984) ("The general rule is, of course, that the pleadings provide the framework within which relief may be granted."); *State v. Herrera-Sorrosa*, 155 Or App 227, 229, 963 P2d 728 (1998)

(declining to apply the *Ball v. Gladden* doctrine because "we cannot infer that the trial court resolved disputed facts consistently with an analysis that it * * * could not have considered"); *Hucke v. BAC Home Loans Servicing, L.P.*, 272 Or App 94, 114, 355 P3d 154 (2015) (observing, in "right for the wrong reason" context that, "[w]here plaintiff pleaded and pursued claims for declaratory relief to a trial on the merits, he cannot seek to prevail on appeal by pursuing an entirely different claim as a basis for declaratory relief that was never pleaded or raised below").

That narrowing leaves us with a single—and undisputedly flawed—basis for the city's counterclaims: the theory that LDS had a contractual obligation under the development agreement to complete the improvements. As already noted, neither the city nor DSIC defend the trial court's ruling on that basis on appeal. Beyond that, there is no evidence in the summary judgment record to support it. Although LDS is REDG's "successor" in the sense that it owns property that REDG once owned, there is no evidence that it assumed REDG's contractual obligations under the development agreement, or that LDS is REDG's heir, executor, administrator, or assign. *See* 280 Or App at 615-16 (describing the development agreement's successor interest clause). For those reasons, the city's two counterclaims lack evidentiary support.

Accordingly, because LDS has no contractual duty to fulfill REDG's obligations under the development agreement (as opposed to an obligation potentially arising from an encumbrance), the trial court erred in granting summary judgment on the city's first and second counterclaims.

Reversed and remanded as to the grant of summary judgment in favor of the City of Eugene's first and second counterclaims; otherwise affirmed.